**UNITED STATES, Appellee,**

v.

**Marla BARNES, Defendant, Appellant.**

No. 97–2251.

United States Court of Appeals,
First Circuit.

Heard May 6, 1998.
Decided Oct. 27, 1998.

Stephen B. Hrones with whom Hrones & Garrity was on brief for appellant.

Jennifer H. Zacks, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before TORRUELLA, Chief Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Marla Barnes appeals from her conviction for conspiracy to smuggle cocaine into the United States and criminal forfeiture of $2,900 in drug proceeds. Her appeal presents a single question: whether she was tried within the 70–day time limit imposed by the Speedy Trial Act, 18 U.S.C. § 3161 (1985).

On the first day of trial, Barnes moved to dismiss the indictment, alleging that her right to a speedy trial had been violated. The district court denied the motion, and Barnes was subsequently tried and convicted on both counts. For the reasons that follow, we conclude that the trial court erred when it denied defendant's motion to dismiss. In this case, the court failed to police the speedy trial clock vigilantly during a crucial 5–month period beginning in the fall of 1996 when the trial date was inexplicably adjourned. As a result, the 70–day limit was exceeded by some 121 days. We find, however, that the seriousness of the offenses with which defendant was charged, the absence of any actual prejudice to her, and defendant's own failure to promptly assert her speedy trial rights warrant dismissal of the indictment without prejudice.

1. Reynaldo Barnes's appeal is not before us. For the sake of clarity, we will hereinafter refer

## BACKGROUND

We begin by recounting the path Barnes's case took below. On August 10, 1995, a complaint was issued in the United States District Court for the District of Massachusetts charging Barnes and her brother Reynaldo Barnes with conspiracy to import cocaine into the United States from Panama.[1] Federal law enforcement agents arrested Barnes on August 11, 1995 in Brooklyn, New York, pursuant to a warrant issued by the United States District Court for the District of Massachusetts. She appeared before a magistrate judge in the Eastern District of New York that same day. An order was entered 3 days later removing Barnes to the District of Massachusetts.

On August 23, 1995, a federal grand jury returned a two-count indictment against Barnes and her brother, charging them with conspiracy to import cocaine under 21 U.S.C. § 963 (1998) and with criminal forfeiture under 21 U.S.C. § 853 (1998).

Barnes's first appearance before a judicial officer in Massachusetts took place on September 25, 1995 before United States Magistrate Judge Joyce L. Alexander. A briefing schedule for pretrial motions was set at this conference: all motions were to be filed by October 3, 1995.

On September 27, 1995, Reynaldo Barnes filed a motion seeking additional time to file pretrial motions up to and including October 13, 1995. This motion was granted.

Barnes was arraigned on October 3, 1995; she entered a plea of not guilty to both counts. At defendant's request, Magistrate Judge Alexander extended the time to file pretrial motions to October 20.

On October 20, 1995, defendants filed a flurry of pretrial motions seeking, inter alia, a bill of particulars, various discovery items, and Jencks Act material. Magistrate Judge Alexander held a hearing on these motions on November 30, 1995, after which she took the matters under advisement, and eventually disposed of all motions on December 14, 1995. An order of excludable delay was

to Marla Barnes as "Barnes" and Reynaldo Barnes by his full name.

thereafter entered, excluding the period of time from October 20 to December 14, 1995.

There was no formal activity in the case until January 24, 1996, when the government formally moved the court to schedule a status conference to "enable the Court and parties to establish a firm date for trial, facilitate the identification and resolution of any anticipated evidentiary issues at trial, and possibly facilitate the resolution of this case prior to trial." The district court granted the motion on January 31, 1996, and scheduled a conference for February 20, 1996. By letter dated February 7, 1996, Reynaldo Barnes requested that the conference be adjourned because his counsel, William P. Homans, was to be on trial in another case that same week. The court granted the motion on February 9, rescheduling the conference for March 4, 1996. On March 4, 1996, the status conference was held, during which the court set a trial date of April 8, 1996.

On March 18, 1996, defendants jointly moved to continue the trial date to June 10, 1996 and to exclude the time from the date of the motion until the new trial date. Defendants cited three reasons for the request: Mr. Homans was recovering from pneumonia, defendants were engaged in ongoing plea negotiations with the government, and a conflict had arisen in the trial schedule of Barnes's attorney, Stephen B. Hrones. Their motion was granted by the court on March 19, 1996.

The critical chain of events central to this appeal then occurred. On May 30, 1996, Barnes moved the district court for another continuance "until sometime in late September or early October." She explained that her counsel was engaged in another trial on June 10. The court granted the motion by memorandum order on June 3, 1996 and continued the trial until October 7, 1996 at 11:00 a.m.

The motion for a continuance was followed by defendants' joint motion to "waive their speedy trial rights from June 10 until the date set for the new trial in the fall of 1996." The motion to waive was granted by margin

order on August 28, 1996, and the court expressly excluded time from the Speedy Trial clock through October 7, 1996.

Although it is far from certain precisely what happened next, the record suggests that the court set this matter down for trial for October 7, 1996 at 11:00 a.m. and then telephonically adjourned the trial without date.[2] No one appeared for trial on October 7. Neither defendant nor the government can explain why the trial did not go forward. Neither the government nor any of the defendants apparently requested a continuance or objected to it; no one seems to remember *when* the trial was adjourned. The district court never explicitly excluded time from the speedy trial clock or made any findings as to why the adjournment was required in the interests of justice. It did not issue a written order.

On December 3, 1996, after two months had passed, the parties jointly moved the court for a status conference for the purpose of setting a trial date. The motion included an odd statement: "the parties jointly move to exclude the period of delay in the interests of justice and due to continuing plea negotiations, *from the date of entry of an Order on defendant's pre-trial motions until such date as this Court sets for trial.*" (Emphasis added.) By its terms, the motion sought a retroactive and an unlimited forward-looking exclusion of time. The motion was signed only by the Assistant United States Attorney ("AUSA") on behalf of both the government and Barnes. Barnes's attorney, Mr. Hrones, did not sign the papers.

Seven days later, Barnes filed a "Motion to Correct a Joint Motion for Status Conference" protesting the government's effort to have time excluded by the court. This document stated that "although [her] attorney authorized the Joint Motion for Status Conference he did not give authority to [the AUSA] to add a paragraph indicating that the defendant had agreed to exclude the period of delay." Barnes indicated that she opposed any exclusion of the delay, having

2. At oral argument, defense counsel stated that he may have received a phone call from the district court's chambers informing him that the

trial had been postponed, but did not recall for sure if the call was made or when it occurred.

"made clear for some time now to [the AUSA] that [sh]e want[ed] a trial." Accordingly, Barnes requested that the court "strike the defendant's name from her request to exclude the delay." The government did not oppose defendant's motion to correct.

On March 7, 1997—some three months later—the court sent defendants and the government a notice informing them that a conference had been scheduled for March 25, 1997. The court did not exclude any time, either forward or backward, as requested in the purported joint motion.

Two noteworthy events transpired at the March 25 status conference. First, Reynaldo Barnes moved to change his plea. The motion was granted and a date was set for his anticipated plea of guilty. Second, the court reset Barnes's trial date for May 5, 1997.

On April 4, 1997, the government, with defendant's consent, filed a motion to continue the trial from May 5 to May 19, 1997. Accordingly, the district court memo endorsed the motion and rescheduled trial for May 19, 1997.

On May 15, 1997, Reynaldo Barnes pled guilty to both offenses. The next day, May 16, 1997, the government filed a motion *in limine* seeking an order permitting the government to use transcripts of recorded conversations between undercover agents and defendants.

On May 19, 1997, the first day of trial but before jury selection, Barnes moved to dismiss the indictment on the basis of the Speedy Trial Act. The court denied the motion but made no factual findings beyond observing that Mr. Hrones was on trial in another case on May 5, "the last time the case was going to be scheduled," and that Reynaldo Barnes's counsel, Mr. Homans, was sick for a period of time. The court then resolved all outstanding motions *in limine* and empaneled the jury.

Barnes was tried and convicted on both counts, and was eventually sentenced to 188 months in prison, to be followed by five years of supervised release. She then timely filed this appeal.

## DISCUSSION

### I. *Standards*

The Speedy Trial Act "commands that a defendant be tried within 70 days of the latest of either the filing of an indictment or information, or the first appearance before a judge or magistrate." *Henderson v. United States*, 476 U.S. 321, 322, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986); *see* 18 U.S.C. § 3161(c)(1). The sanction for failure to adhere to this time limit is severe—the indictment is dismissed on motion of the defendant. *See* 18 U.S.C. § 3162(a)(2). In determining whether a violation of the Act has occurred, certain "periods of delay shall be excluded in computing the time within which ... the trial ... must commence." 18 U.S.C. § 3161(h).

The following are among the kinds of delays that are properly omitted from this calculation:

[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to—

. . . .

(F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

. . . .

(J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

. . . .

(8)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h).

We review the district court's denial of defendant's motion to dismiss based on

the Speedy Trial Act *de novo. See United States v. Rodriguez,* 63 F.3d 1159, 1162 (1st Cir.1995), *cert. denied,* 516 U.S. 1032, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995). Barnes's motion to dismiss was denied by the court on the first day of trial without any calculation of the Speedy Trial Act timetable. Accordingly, on this appeal "[w]e must start from scratch in the computation of excludable and nonexcludable time under the Act." *United States v. Pringle,* 751 F.2d 419, 429 (1st Cir.1984). We do so in two steps. First, we must "do the basic mathematics and determine the aggregate time elapsed awaiting trial." *United States v. Staula,* 80 F.3d 596, 600 (1st Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 156, 136 L.Ed.2d 101 (1996). Second, we then ascertain how many days should be excluded from the total time. *See id.*

With this analytical framework in mind, we turn to computing the number of days that elapsed in the case at bar.

## II. *Application*

### A. *When Did the Time Begin to Accrue?*

■ The first issue to be resolved is when the speedy trial clock began to tick. Section 3161(c)(1) requires that a defendant be tried within 70 days of the occurrence of one of two events: the filing of the indictment or the defendant's appearance "before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1).

Barnes, relying on a separate provision of the Act that governs the tolling of time for unreasonable delays associated with the transfer of defendants, argues that any amount of time above and beyond the 10 days between the entry of the order compelling her removal from New York and her actual arrival in Massachusetts should count toward the 70–day limit. Section 3161(h)(1)(H) provides that any unreasonable delay resulting from the transfer of a defendant is includable, and mandates that any such delay in excess of ten days from the date of the order directing transportation and "the defendant's arrival at the destination" be presumed unreasonable.

Barnes's reliance on this provision to start the speedy trial clock is misplaced. It is a tolling provision, not one that sets forth the events that trigger the start of the 70–day period in which a trial must be held. The pre-indictment or pre-appearance transfer of a defendant is not explicitly listed as one of the only two triggering events in section 3161(c)(1), and we decline to read into that provision what was not expressly included by Congress. Accordingly, while delay resulting from such a transfer may count toward the 30–day arrest-to-indictment period, *see* 18 U.S.C. § 3161(b), it does not start the 70–day speedy trial clock. The delay resulting from the transfer of Barnes from New York to Massachusetts thus took place well before the clock even began to run.

■ Applying the terms of the Act, we conclude that time on Barnes's speedy trial clock began to accrue on September 26, 1995, the day after her first appearance before a magistrate judge in the District of Massachusetts. The date of the conference, is, of course, excludable as a "proceeding concerning the defendant." *United States v. Santiago-Becerril,* 130 F.3d 11, 16 (1st Cir.1997). The clock stopped on May 19, 1997, Barnes's first day of trial. A total of 601 days passed between the start of the speedy trial clock and the date it stopped for good on May 19, 1997. We now evaluate which of these days are excludable and which must be counted toward the 70–day deadline.

### B. *Excludable Days*

■ While September 26, 1995 must be counted, the entire period between September 27, 1995 and December 14, 1995 must be excluded from the final tally. On September 27, 1995 Barnes's codefendant moved for an extension of time to file pretrial motions. The motion was granted until October 13, 1995, and the deadline was later extended again until October 20, 1995. It is well-settled that an exclusion of time attributable to one defendant is applicable for all codefendants. *See id.* at 19. Therefore, this time is not counted toward the 70 days. *See United States v. Jodoin,* 672 F.2d 232, 237

(1st Cir.1982) (excluding time that elapsed due to defendant's request for an extension of time as "directly attributable to [his] ... motion"). The magistrate judge also properly excluded the period between the actual filing of the motions (October 20, 1995) and the hearing on the motions (November 13, 1995), for it falls under section 3161(h)(1)(F) as "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, ... such motion." Similarly, the magistrate judge correctly excluded the thirty days between November 14 and December 14 during which she had the initial batch of pretrial motions under advisement. *See* 18 U.S.C. § 3161(h)(1)(J).

The government concedes that the 40 days between December 15 and January 23, 1996 are not excludable. We agree.

### 1. *Motion Requesting a Status Conference*

■ The excludability of the next segment of time turns on whether the government's motion to set a status conference filed on January 24, 1996 is a "pretrial motion" within the meaning of section 3161(h)(1)(F). Barnes argues that such a motion does not qualify as a pretrial motion because it is not of a "substantive" nature. For its part, the government insists that it is a pretrial motion and argues that time should be excluded from the moment the motion was filed until the date of the requested status conference.

We hold that a motion requesting the scheduling of a pretrial conference is a "pretrial motion" so as to trigger an exclusion under the Speedy Trial Act. Section 3161(h)(1)(F) states, rather expansively, that delay resulting from "any pretrial motion" shall be excluded. It does not distinguish between more significant or complex "pretrial motions" and simple or routine motions. For this reason, we have read the term "pretrial motion" broadly to encompass all manner of motions, ranging from informal requests for laboratory reports, *see United States v. Jorge,* 865 F.2d 6, 11 (1st Cir.1989),

cert. denied, 490 U.S. 1027, 109 S.Ct. 1762, 104 L.Ed.2d 198 (1989), to "implied" requests for a new trial date, *see Santiago–Becerril,* 130 F.3d at 17. A motion requesting the scheduling of a status conference has undeniable "pretrial" significance: all kinds of matters affecting the course of trial, including discovery, motions, and trial dates may be discussed at such a conference. *Cf.* Fed. R.Crim.P. 17.1 ("[T]he court upon motion of any party or upon its own motion may order one or more conferences to consider such matters as will promote a fair and expeditious trial."). There seems to be no good reason to exclude a motion for a status conference from the universe of possible pretrial motions. *See, e.g., United States v. Bellucci,* 737 F.Supp. 706, 710 (D.Mass.1990) (Tauro, D.J.) (holding that motion for status conference was pretrial motion for purposes of tolling Speedy Trial Act). Hence, in this case, the clock stopped as soon as the government filed its motion seeking a status conference on January 24, 1996.

■ The next question is how much time should be tolled. The Supreme Court has construed subsection (F) as setting forth a two-tiered approach to determining the extent of excludable delay caused by the submission and disposition of pretrial motions. *See Henderson,* 476 U.S. at 329–30, 106 S:Ct. 1871. For a pretrial motion on which a hearing is held, the entire period from the filing of the motion to the date of the hearing, regardless of when the hearing is scheduled, plus up to 30 additional days while the motion is "under advisement" is automatically excluded. *See id.; Rodriguez,* 63 F.3d at 1163. By contrast, when "motions that require no hearing" are involved, time is tolled only until the "prompt disposition" of the motion, which ordinarily cannot exceed the 30–day "under advisement" period.[3] *Henderson,* 476 U.S. at 329, 106 S.Ct. 1871; *see Santiago–Becerril,* 130 F.3d at 17; S.Rep. No. 96–212, 96th Cong., 1st Sess., at 34 (1979) ("[I]f motions are so simple or routine that they do not require a hearing, necessary advisement time should be consid-

---

3. Time may also be properly excluded to account for the filing of additional submissions necessary for the disposition of a motion or where the

motion presents especially complicated issues. *See Henderson,* 476 U.S. at 331, 106 S.Ct. 1871.

erably less than 30 days."). A motion is deemed to be taken under advisement when " 'the court receives all the papers it reasonably expects.' " *Rodriguez,* 63 F.3d at 1163 (quoting *Henderson,* 476 U.S. at 329, 106 S.Ct. 1871).

Because a motion requesting only the scheduling of a status conference requires no "hearing"—marked by oral argument, factual findings, or legal rulings—but involves merely the simple administrative act of setting a date, it must be resolved within 30 days of the date the Court has received all it expects to properly consider the request. *See Rodriguez,* 63 F.3d at 1165–66; *United States v. Ferris,* 751 F.2d 436, 440 (1st Cir.1984); 18 U.S.C. § 3161(h)(1)(J). It follows that such a motion is resolved as soon as the conference is actually scheduled—not when the various matters for possible discussion, in fact, are broached—and that the clock will start again the following day. The government disagrees, arguing that the clock should be tolled until the actual date of the conference, which it calls a "hearing"; but to adopt this reasoning would contravene the language of the Act. Because the setting of the date resolves the motion in its entirety, the conference cannot possibly represent a "hearing on ... such motion." 18 U.S.C. § 3161(h)(1)(F).

In *United States v. Staula,* 80 F.3d 596 (1st Cir.1996), we held that "a hearing is any on-the-record colloquy in which the district court hears the arguments of counsel and considers those arguments prior to deciding a pending motion." *Id.* at 602. Our reasoning today is entirely consistent with that decision. Once a conference has been set down on a court's calendar, there is no longer any "pending motion" to decide. The motion seeking a status conference has already been resolved.

Needless to say, there are varieties of motions that may or may not require a hearing. But we need not wander too deeply into this thicket today, for we hold only that motions seeking nothing more than the scheduling of a conference must be acted upon within 30 days. In doing so, we emphasize that, consistent with the letter and spirit of the Speedy Trial Act, relatively simple motions should be disposed of expeditiously or the clock will resume ticking.

■ Applying the foregoing principles to the present facts, we find that the clock was tolled from January 24 until January 31, 1996. The clock ran for the next six days and stopped again on February 7, 1996, when Reynaldo Barnes moved to adjourn the conference. Although the court made no express findings in granting the motion, the letter motion itself makes clear that Reynaldo Barnes's counsel was unavailable until at least the first of March due to conflicts with his work and personal schedules. Thus, the court's decision to grant the continuance comports with the requirements of section 3161(h)(8)(A). *See United States v. Rush,* 738 F.2d 497, 507 (1st Cir.1984) ("[I]t is not necessary for the court to articulate the basic facts when they are obvious and set forth in a motion for a continuance."), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1355, 84 L.Ed.2d 378 (1985). The clock resumed on March 5, 1996, the day after the conference. The clock temporarily stopped again on March 18 due to defendants' two overlapping requests to postpone the trial, and remained stopped until October 8, 1996.

At this point, 61 nonexcludable days had already accrued.

### 2. Adjournment of the October 8, 1996 Trial Date

■ This case turns on the period starting with the October 8, 1996 trial date. Frankly, we, like the attorneys for both sides, are confused as to the exact circumstances surrounding the adjournment of the October 7, 1996 trial date. It is a mystery. Neither the government nor any of the defendants formally moved for a continuance, although it is theoretically possible that someone so moved informally. One would, however, usually expect one party to accuse the other of requesting a continuance if an informal request had been made by one of the lawyers; but no illuminating bout of finger-pointing has erupted. This suggests that the court, on its own volition, ordered the

adjournment without date.[4] The government contends that the trial was adjourned upon consent of defendant, but the record reflects no such consent. To accept the government's position therefore requires us to infer from silence that defendant's consent was given. This we cannot do. What is apparent is that even assuming a trial date was set for October 7 and then continued by the court without objection, the grant of such a continuance—of which there is no contemporaneous written or oral record—fails to comply with the Act. *See* Amended Speedy Trial Act Guidelines, Aug. 28, 1981, *reprinted in* Robert L. Misner, *Speedy Trial Federal and State Practice*, App. B, at 775 ("The fact that the defendant has requested the continuance or consents to it is not in itself sufficient to toll the operation of the time limits."). Whether time resulting from a continuance may toll the Act depends on whether the court abused its discretion by granting the continuance. *See Pringle,* 751 F.2d at 432.

■■■ We find that the court should not have adjourned the trial date in the manner that it did. A trial court's discretion to invoke the ends of justice exception by granting a continuance is exceedingly "narrow," and should not be done "lightly or routinely." *United States v. Mitchell,* 723 F.2d 1040, 1044 (1st Cir.1983).

While a continuance may have been entirely justified under the circumstances, the court failed to set forth "in the record of the case . . . its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interest of the public and defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). There is simply no record of the continuance. Although we

have held that there is no need to articulate the basic facts critical to a motion for a continuance when they are set forth in the motion papers, *see Rush,* 738 F.2d at 507, here, no one moved to continue the trial. Consequently, we cannot say with any reasonable certainty that the continuance met the ends of justice standard, especially where the parties themselves have offered no explanation for why or when the trial date was adjourned. The lack of findings is particularly troubling because of the open-ended nature of the continuance granted here.[5] A firm trial date was not set until the March 25, 1997 conference—more than five months after it was last continued. For these reasons, we find that the trial court abused its discretion in granting (or *sua sponte* ordering) the continuance, and the resulting delay of 56 days must be counted against the speedy trial clock.

### 3. *The Pringle Exception*

■■ In an effort to defeat the operation of the Act, the government argues that the entire period of time from October 7, 1996 onward must be excluded because Barnes waived her right to a speedy trial. The government maintains that Barnes's June 6, 1996 waiver impermissibly lulled it and the district court to sleep. We reject the government's theory of an unlimited waiver.

■■ Defendants generally may not elect to waive the protections of the Act. The reason is that the public has at least as great an interest as the defendant in an expeditious criminal trial. *See United States v. Hastings,* 847 F.2d 920, 923 (1st Cir.) (noting that society has a "general interest in resolving the guilt or innocence of those accused of

---

4. There is another, though remote, possibility based on the trial court's comment about the health of Reynaldo Barnes's trial counsel after denying Barnes's motion to dismiss. Perhaps Mr. Homans, who was sick from pneumonia during this period and eventually died, informally moved for a continuance at some point. Yet this scenario is unlikely. The trial court's ambiguous allusion to his illness may have simply been to his earlier request for an adjournment on March 18, 1996. In addition, the government itself later acknowledged to the trial court that Mr. Homans's health "didn't create any problem" and that his associate skillfully replaced

him as early as August of 1996. Finally, the government has not once argued on appeal that Mr. Homans's battle with pneumonia caused the October 8 trial to be adjourned. Even if this explains why the court adjourned the trial, however, the reason should have been made explicit in the record.

5. While open-ended continuances are not *per se* impermissible in this Circuit, we have often stated that "it is generally preferable to limit a continuance to a definite period for the sake of clarity and certainty." *Rush,* 738 F.2d at 508.

crime rapidly (consistent with fundamental fairness) and punishing those found to be guilty"), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988).

In *United States v. Pringle,* 751 F.2d 419 (1st Cir.1984), we crafted a limited unclean hands exception to this rule. *Cf. United States v. Gambino,* 59 F.3d 353, 360 (2d Cir.1995) ("[T]hose courts recognizing the [*Pringle* ] exception have placed tight restrictions on the finding of waiver."), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996). In *Pringle,* defendants had sought to continue the trial, declaring that "all defendants waive[d] their rights to a speedy trial." 751 F.2d at 433. Defendants later moved to dismiss the indictment based on the delay that ensued in selecting a new trial date. The district court denied the motion. We affirmed, holding, *inter alia,* that although a defendant cannot waive the right to speedy trial, he or she cannot "lull[ ] the court and prosecution into a false sense of security only to turn around later and use the waiver-induced leisurely pace of the case as grounds for dismissal." *Id.* at 434.

The government here asserts that defendants' June 6, 1996 waiver was indefinite in scope, tolling the clock up to and including the first date of trial in May 1997.[6] Relying on *Pringle,* the government argues that the waiver provided by defendants caused the delay by misleading the government and the court into believing that any date would be acceptable to them. While any waiver would technically be inoperative, if the government is correct about the nature of the waiver, the delay that resulted from the waiver would be excludable under *Pringle.*

We are not persuaded that the *Pringle* exception applies to the extent suggested by the government. While defendants' waiver definitely contributed to a delay until October 7, Barnes cannot be held responsible for the delay that occurred after trial was initially set for that date and then subsequently continued. We reach this conclusion for several reasons.

First, defendants did not offer an open-ended waiver. Unlike the sweeping language contained in defendants' waiver in *Pringle,* the waiver at issue does not represent defendants' consent to an indefinite exclusion of time, but authorized time to be excluded only "until the date set for the new trial in the fall of 1996." By its terms, the document did not waive Barnes's speedy trial rights indefinitely.

Second, even if there was any ambiguity as to the scope of the waiver, the extraneous evidence conclusively puts that doubt to rest in Barnes's favor. The waiver closely followed and was inextricably bound up with Barnes's request for an adjournment until "late September or early October." Thus, read together with her motion to continue, the waiver put the district court and the government on notice that Barnes desired a trial by October 1996.

Third, no one was "lull[ed]" to sleep by the waiver. The "joint motion for a status conference" later drafted by the government proves this. In the motion, the parties purportedly sought an exclusion of time "from the date of an entry of an Order on defendant's pre-trial motions until such date as this Court sets for trial." (A.37). But if the government had truly believed that Barnes had already provided an open-ended waiver on June 6, 1996, such a broad and seemingly retroactive exclusion of time would have been unnecessary. The government's own actions therefore suggest that the government itself believed that there might still be a speedy trial problem *even after* defendants signed the waiver.

In addition, the trial court acted on defendants' motions (including the waiver) by continuing the trial only until October 7, 1996, showing that it, too, understood that Barnes wished to be tried by October 1996. The date set by the court stood at the very end of the spectrum of Barnes's waiver. At best, Barnes may be said to have consented to and caused the delay throughout the fall of 1996, tolling the clock under *Pringle* until early

---

**6.** The government argues, implausibly, that "the court could have scheduled the trial for a much later date, and still been within the terms of defendant's waiver;" that "[i]n light of this waiv-er, the defendant should not be allowed to use the period of delay prior to the setting of the new trial date in support of her request for dismissal."

October, but certainly no later. In other words, the limited waiver did not "create the delay[ ]" that transpired when the date was adjourned from October 7. *Id.* at 434.

Nothing in the record even remotely suggests that Barnes strategically attempted to "sandbag" anyone. Instead, the record shows that she made clear to the court and prosecution that she desired to be tried in the fall of 1996, at the latest by "early October." That did not happen. The reasons for this delay have not been made clear by the guardians of the speedy trial clock: the court, and to a lesser extent, the government. Whether the continuance was justified and the court neglected to make the necessary ends of justice findings or the government simply lost track of the days makes no difference. The unexplained delay occurred; it must be accounted for.

■ If Barnes is guilty of anything during this crucial time frame, it is that she did not object earlier. But her mere failure to object to a delay does not constitute "work[ing] both sides of the street," *Pringle,* 751 F.2d at 434, and it does not excuse the trial court's failure to make explicit findings as to why a continuance best served the interests of justice. To hold otherwise would be to permit the finding of a waiver whenever a defendant fails to object to a continuance. Such a conclusion would turn the Act on its head by shifting the burden of enforcing the Act to the defendant.

### 4. *Post–Violation Delay*

Although the Speedy Trial Act was violated as early as October 16, 1996, we press on with our analysis to discern the full extent of the unexcused trial delay. Because the continuance was defective, the clock continued to run unabated until December 3, 1996, the date the government filed the "joint motion" seeking the scheduling of a conference for the purpose of setting a firm trial date and an exclusion of time.

The motion for a status conference was considered to be under advisement on December 10, 1996, the date Barnes filed her opposition to the request to exclude time. Hence, the 30–day period from December 11,

1996 through January 9, 1997 is excluded. But the trial court did not act on this motion until March 7, 1997, long after this 30–day window had shut, and "[w]e see no reason why the pretrial conference could not have been scheduled sooner than it was." *Mitchell,* 723 F.2d at 1048. Accordingly, January 10, 1997 through March 24, 1997, the additional 74 days that accrued before the court actually resolved the motion, must count on the clock.

■ The government also contends that terms of the so-called joint motion for a status conference warrant excluding the time from December 3, 1996 onward. The problem with this argument is that the court never actually excluded any time based on this motion. It simply set a date for a conference months later, either ignoring or implicitly rejecting the request to exclude time. Given the hotly-disputed nature of the request, including whether Barnes had given her consent to make it, we cannot say that the court erred by refusing to exclude time. For this reason, the motion does not toll the Act for more than the 30 days during which it should have been decided.

■ Moving forward, we find that the 56 days between March 25, 1997 and May 19, 1997 must be excluded. At the March 25 conference, Reynaldo Barnes moved to change his plea, and the court accepted his guilty plea at a hearing on May 15, 1997. The intervening time is not counted, for "all of the days between the date a codefendant files a motion for a change of plea and the date of the change of plea hearing itself are excludable from the [Act]'s seventy-day time limit." *Santiago–Becerril,* 130 F.3d at 20. Moreover, the overlapping adjournment sought by Barnes covers the period from April 4, 1997 until the first day of trial. It goes without saying that the government's *in limine* motion filed May 16, 1997 also tolled the clock until the motion was resolved on the first day of trial.

To summarize, we find that 191 days of nonexcludable time elapsed between Barnes's first appearance before the magistrate judge in the District of Massachusetts and the first day of trial. Forty-one days passed by the time of defendant's first conference before

the district court; 20 days elapsed between February 1 and October 8, 1996; 56 days passed between the October 8, 1996 trial date and the filing of the joint motion requesting a conference on December 3, 1996; and 74 days of unexcused time elapsed while the motion requesting a pretrial conference was pending (excluding the 30–day under-advisement period). The 70–day limit was clearly exceeded. The indictment should have been dismissed.

### C. The Remedy

■ The final inquiry is whether the indictment should now be dismissed with or without prejudice. Our usual practice is to remand to the trial court to address this question, for it is best situated to assess the degree of the violation and its likely effect on the parties involved. Nevertheless, we find that the only proper remedy in this case is to dismiss the indictment without prejudice. For this reason, as well as for the sake of judicial economy, we make this determination in the first instance. *See United States v. McAfee*, 780 F.2d 143, 146 (1st Cir.1985) (deciding proper remedy on appeal).

■ Our analysis is guided by the following considerations: (1) the seriousness of the offenses; (2) the circumstances leading to the delay; (3) the impact reprosecution would have on the administration of justice and the enforcement of the Speedy Trial Act; and (4) any related miscellaneous factors, including whether the delay resulted in actual prejudice to the defendant. *See Hastings*, 847 F.2d at 924; 18 U.S.C. § 3162(a)(2).

### 1. Seriousness of the Offenses

As to the severity of the offenses, we find that this factor weighs strongly in favor of dismissal without prejudice. We have often observed that "the graver the crimes, the greater the insult to societal interests if the charges are dropped, once and for all, without a meaningful determination of guilt or innocence." *Hastings*, 847 F.2d at 925. The government charged Barnes with conspiracy to import 110 kilograms of cocaine into the United States in the type of drugs-for-profit scheme that Congress has deemed a serious felony. *See, e.g., United States v. Munoz*, 36

F.3d 1229, 1239 (1st Cir.1994) ("Conspiracy to distribute a large quantity of cocaine . . . is a serious crime"), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1120 (1995); *Hastings*, 847 F.2d at 925 ("By their very nature, drugs-for-profit offenses are extremely serious.").

Defendant attempts to minimize the gravity of the charges leveled against her by asserting that the actual importation of drugs never took place and by claiming that the evidence at trial suggests that no agreement was ever reached as to the criminal enterprise. These arguments are easily rejected. First, the mere fact that the criminal plan was never successfully carried out is immaterial to whether the charge of conspiracy constitutes a serious offense. As noted before, there can be little doubt that it is. Second, despite Barnes's characterization of the evidence of her intent to conspire as weak, the trial record, which we must view in the light most favorable to the government, shows otherwise: a jury convicted Barnes of conspiring to import cocaine and that verdict necessarily included a finding that Barnes had agreed with others to traffic in drugs. In short, that defendant was charged with and eventually convicted of a drug trafficking conspiracy involving a considerable amount of drugs thus militates heavily in favor of permitting reprosecution.

### 2. Circumstances Leading to the Delay

We next consider the relative blame each side bears in producing the unexcused delay. The portrait of delay is somewhat complex. There is no question that the primary blame must be assigned to the court. The district court should have articulated its reasons for indefinitely continuing the trial date from October 8, 1996 and should not have let several months slip by before scheduling a new conference, much less a firm date for trial. Likewise, the prosecutor, who should already have been aware that, as of the fall of 1996, at least 61 nonexcludable days had elapsed, failed to monitor scrupulously the passing days and alert the court that the deadline fast approached. "Even though a prosecutor does not bear the burden of monitoring the court's compliance with the

[Speedy Trial Act] in absence of an announced rule, district courts do look to prosecutors for assistance as officers of the court." *United States v. Ramirez*, 973 F.2d 36, 39 (1st Cir.1992).

 At the same time, however, there is no evidence that the delay was caused by bad faith conduct on the part of the prosecutor. We do note, without so finding, that government's motion seeking a status conference and a broad exclusion of time could be viewed as causing some of the post-violation delay. A plausible interpretation of the facts certainly is that as December 1996 drew near, the government's lawyer suddenly realized that there might be a speedy trial problem and hastily added a retroactive and open-ended exclusion in an attempt to remedy the perceived difficulty. The language contained in the motion may have misled the court into believing that Barnes had no objection as to when she might be tried. But we do not attach too much weight to this possibility, for even if the government's counsel mischaracterized the extent of defendant's consent for the December 3, 1996 motion, the speedy trial violation had already occurred. Thus, the government's conduct did not actually bring about the violation. There is nothing in the record to suggest that prosecutorial misconduct rather than administrative negligence caused the 70–day deadline to be exceeded in the first place. Where, as here, the actual speedy trial violation resulted solely from neglect rather than intentional misconduct, that circumstance tips ever so slightly in favor of dismissal without prejudice. *See, e.g., Hastings*, 847 F.2d at 925–26.

There remains, of course, the possibility that the government's actions exacerbated the delay even if they were not directly responsible for producing the violation. We think, however, that Barnes's prompt clarification on December 10, 1996 that she was not waiving her speedy trial rights but was ready for trial sufficed to minimize this danger.

Finding reason to spread the blame, we note, too, that Barnes herself could have pushed the proceedings along at various crucial junctures but chose not to do so. She did not behave like a defendant who wanted her day in court *posthaste*. Instead, she requested several continuances in the spring of 1996. Furthermore, she could have objected to the adjournment of the October 7, 1996 trial date or at least have voiced her preference for a specific trial date, but she failed to clearly and loudly demand a quick trial. And rather than immediately asserting her speedy trial rights once the violation occurred, she consented to one additional lengthy continuance after the 70–day period had already run its course. Defendant never raised the speedy trial claim until the last possible moment—when a trial was simply unavoidable. Although Barnes was under no obligation to monitor the clock, we nevertheless find that her willingness to abide the unexcused delay of some 5 months and participate in further delay should be counted against her. *Cf. Santiago–Becerril*, 130 F.3d at 22 (weighing defendant's failure to demand speedy trial until eve of trial against him in assessing Sixth Amendment speedy trial claim); *McAfee*, 780 F.2d at 146 (dismissing indictment without prejudice where defense counsel bore some blame for delay). We have already determined that the indictment must be dismissed. She should not be doubly rewarded for sitting silently as the delay mounted.

### 3. Effect of Reprosecution on Administration of *Justice and Enforcement of the Act*

The effect that reprosecution would have on the administration of justice and enforcement of the Speedy Trial Act likewise does not call for barring reprosecution. To be sure, the orderly administration of justice necessarily is hindered to some degree whenever the Act is violated. Nevertheless, a retrial should not take more than one week (the first trial lasted four days), and there is no reason to believe that reprosecution would otherwise have a deleterious effect on the fair and efficient administration of justice.

Similarly, enforcement of the Speedy Trial Act would not be unduly hampered by allowing Barnes to be retried. There is little doubt that the harsh remedy of dismissal with prejudice has greater deterrence value than its counterpart. But considerations of general deterrence are not dispositive or else dismissal with prejudice would impermissibly

become the preferred tool. *See United States v. Taylor,* 487 U.S. 326, 334, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988) ("Congress did not intend any particular type of dismissal to serve as the presumptive remedy for a Speedy Trial Act violation."). Moreover, the fact that a retrial might be necessary at all is often deterrence enough. We find that to be true here. As the Supreme Court has observed,

> Dismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds. Given the burdens borne by the prosecution and the effects of delay on the Government's ability to meet those burdens, substantial delay well may make reprosecution, even if permitted, unlikely.

*Id.* at 342, 108 S.Ct. 2413. Conversely, little would be gained in the case at bar by foreclosing the possibility of another trial.

### 4. Miscellaneous Factors: Length of Delay *and Actual Prejudice*

Two final closely related considerations merit discussion: the length of delay and actual prejudice. On its face, the length of delay in this case—*more than twice the extent statutorily permissible*—is troubling. At first blush the sheer length of unexcused delay might suggest actual prejudice, but Barnes has never once claimed that the delay adversely affected her ability to prepare for trial, much less articulated any facts suggesting how she was actually prejudiced by the tardy trial date. The absence of any consequential prejudice to defendant points toward permitting a new trial. *See Taylor,* 487 U.S. at 341, 108 S.Ct. 2413.

Weighing all of these circumstances as a whole, we conclude that dismissal without prejudice is the appropriate remedy. In fashioning the proper curative, we find dispositive that the crimes charged are grave, that there is no evidence of bad faith conduct on the part of the government, that the record reveals no actual prejudice to the defendant, and that defendant contributed to some of the delay by repeatedly seeking adjournments and by not asserting her rights as soon as the violation occurred.

## CONCLUSION

The decision of the district court denying defendant's motion to dismiss is *reversed,* her conviction and sentence are hereby *vacated,* and the indictment is *dismissed as to her without prejudice.*

*So ordered.*