**UNITED STATES of America, Plaintiff,**

v.

**David GOMEZ–OLMEDA, Defendant.**

**No. CR. 03–073(JAF).**

United States District Court, D. Puerto Rico.

Nov. 12, 2003.

Hector A. Deliz, Deliz & Torres Gonzalez, Hato Rey, PR, Edward S. Staffman, Tallahassee, FL, for David Gomez–Olmeda aka Junito King Cabra, defendant.

Pretrial Services, U.S. Pretrial Services, U.S. Probation, U.S. Probation Office, U.S. Marshal, U.S. Marshal Service, Lynn M. Doble–Salicrup & Edwin Vázquez, Asst. U.S. Atty's, United States Attorney's Office, Torre Chardon, San Juan, PR, for U.S. Attorneys.

## OPINION AND ORDER

FUSTE, District Judge.

We are presented with novel issues which require that we determine when prosecutorial mismanagement not only implicates the rights of a defendant and transgresses the boundaries of fair play, but also jeopardizes the proper functioning of the judicial system. Here, Defendant was confronted repeatedly with a host of inequities which collectively compromised his ability to adequately defend himself— an unfairness all the more severe because the penalty Defendant faces is that of death.

Defendant was denied court-ordered discovery which Defendant, and this court, concluded was necessary to develop an adequate mitigation defense. Defendant engaged in death penalty plea negotiations premised on an indictment which lacked the basic requirements necessary to impose the death penalty. Defendant participated in these plea negotiations unaware that a sealed superseding indictment did not simply add a new co-defendant, as alleged, but also appended the aggravating factors which made it compliant with the death penalty requirements. Defendant's counsel was then misled about the nature of a meeting before the Department of Justice ("DOJ"), thinking its purpose was only to discuss a proposed plea agreement, whereas, in reality, it was also meant to discuss the possibility of defendant receiving the death penalty. Moreover, the prosecution submitted its plea bargain to the Attorney General premised not on the defective original indictment upon which it had been negotiated, but on the sealed superseding indictment.

Defendant was denied the opportunity to present an adequate mitigation defense: By the Assistant United States Attorney Lynn Doble–Salicrup's ("AUSA") continued denial of the ordered discovery which related to mitigation; by the sealing of a superseding indictment which purportedly merely added a defendant, but in fact corrected the prosecution's fatal omission of aggravating factors which would allow the government to seek the death penalty; by the AUSA's belated and misleading characterization of the DOJ meeting; by the AUSA's submission of her Memorandum to the Assistant Attorney General premised not on the faulty indictment which was the basis for the negotiated plea agreement, but on the superseding indictment, the contents of which the Defense had no knowledge. This wrongdoing toward Defendant is compounded by the government's attempt to ratify their errors by asking this court to dismiss the original indictment and accept the superseding indictment, without complying with the basic requirements and procedures for doing so. Through these measures, the AUSA evidenced an obvious level of inexperience and lack of competence in handling a death penalty case. A case of this severity should not become an opportunity for a novice attorney to practice her prosecutorial skills. We fail to comprehend how the AUSA's immediate supervisor, AUSA Edwin Vázquez, present at the initial proceedings before this court, condoned, tacitly or explicitly, the different decisions made in this case. The prosecution's behavior and ex-post-facto correction of mistakes, transgresses the prosecution's duty to the court, the public, and ultimately the profession itself.

Defendant, David Gómez–Olmeda ("Defendant"), has been charged with assaulting an individual and putting his life in jeopardy with intent to rob, steal, or purloin property of the United States in violation of 18 U.S.C. §§ 2114 and 2 (Count I); robbing from an individual United States property in violation of 18 U.S.C. §§ 2112 and 2 (Count II); assaulting an individual and robbing him and using a firearm in relation to a crime of violence, causing the individual's death in violation of 18 U.S.C. § 924(j) and 2 (Count III); attempting to destruct United States property by fire in violation of 18 U.S.C. §§ 844(f)(1) and 2 (Count IV); attempting to damage or depredate United States property in violation of 18 U.S.C. §§ 1361 and 2 (Count V); being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2) (Count VI). *Docket Document No. 7.* Defendant moves to strike the death penalty certification in his case pursuant to Local Rule 428; 18 U.S.C. § 3593 (2000 & Supp.2003), the Fifth and Sixth Amendments, U.S. CONST., amends V & VI. *Docket Document Nos. 118, 129–132.* The prosecution moves to dismiss the Original Indictment ("the Original Indictment"), *Docket Document No. 143,* and to arraign Defendant on the First Superseding Indictment ("the Superseding Indictment"). *Docket Document No. 142.* Defendant opposes these motions. *Docket Document No. 144.*

## I.

### *Relevant Factual and Procedural History*

On March 12, 2003, Defendant was indicted and arraigned. *Docket Document No. 7.* He pled not guilty to all counts of the Original Indictment. *Docket Document Nos. 7, 12.* On March 17, 2003, the case was identified as a death penalty case pursuant to Local Rule 428(2). *Docket Document No. 17.* On July 2, 2003, a sealed Superseding Indictment was issued as to Defendant on all counts. *Docket Document No. 83.* It remained sealed until September 24, 2003. *Docket Document No. 137.* Defendant has still not been

arraigned on the Superseding Indictment, *Docket Document No. 142*, nor has the Original Indictment been dismissed. *Docket Document No. 143.*

On August 8, 2003, Defendant first moved to compel discovery of, *inter alia*, materials relating to the aggravating and mitigating factors necessary for Defendant's upcoming presentation before the Department of Justice regarding issues of mitigation. *Docket Document No. 91.* On August 19, 2003, Defendant filed his second motion to compel discovery. *Docket Document No. 94.* The court granted Defendant's first motion to compel discovery and the government was given until September 2, 2003, to comply. *Docket Document No. 97.* On August 19, 2003, in a status conference before the court, the parties announced a plea agreement subject to the Attorney General's approval. *Docket Document Nos. 131, Exh. A, 120, Exh. B.* It is obvious that the plea agreement had been premised on the Original Indictment, for the terms of the agreement were outlined in correspondence between defense counsel and the AUSA in a letter dated June 30, 2003, two days before the Superseding Indictment was obtained. *Docket Document No. 128, Exh. A.* A change-of-plea hearing was then set for September 23, 2003. *Docket Document Nos. 96, 115.*

In late August, with the change-of-plea hearing still set for September, Defense Counsel, Edward Stafman ("Mr. Stafman"), was advised that on September 8, 2003, a meeting would be held before the Capital Crimes Unit Committee of the Department of Justice in Washington, D.C. *Docket Document No. 120.* In a letter to the AUSA, dated August 26, 2003, Mr. Stafman made undeniably clear that due to the proposed plea agreement, he had ceased researching mitigation issues for his client. *Id.* at Exh. A. In a follow-up letter dated September 3, 2003, Mr. Stafman informed the AUSA that, in light of the plea agreement, he remained unclear about the meeting's purpose. That is, he was unsure if the meeting was to make a death penalty determination or to approve the pending plea agreement. He reiterated that he would be unprepared to discuss matters of aggravation and mitigation, particularly in light of the government's continued noncompliance with the court's discovery order. *Id.* at Exh. B. In response, on September 4, 2003, the AUSA informed Mr. Stafman that because the Washington, D.C. meeting had not yet transpired, the Department of Justice had not had the opportunity to consider the parties' proposed plea agreement offers. *Id.* at Exh. C. As to his concerns, she divulged nothing more.

In her Memorandum to the Assistant Attorney General dated September 3, 2003, the AUSA asserted that Defendant, as part of his proposed plea agreement, would plead guilty as to Count Three of the Superseding Indictment, although, at that time, Defendant had yet to see the sealed Superseding Indictment and Defendant and had yet to be arraigned. On September 17, 2003, the Attorney General—presumably with the misinformed understanding that the prosecution had, in fact, procured a timely Superseding Indictment which included the statutorily-required aggravating factors—rejected the plea agreement and authorized the government to seek the death penalty against Defendant on the Superseding Indictment. *Docket Document No. 116.* On September 22, 2003, the United States filed its Notice of Intent to Seek the Death Penalty if Defendant is convicted under Count Three of the Superseding Indictment. *Id.* Defense counsel, on his way to Puerto Rico for the next day's change-of-plea hearing, learned that his client was now potentially facing a sentence of death when he came across such information in a newspaper article during a layover at the Atlanta

airport. *Id.* When the government filed its Notice of Intent to Seek the Death Penalty, the Superseding Indictment, on which the Attorney General's death penalty endorsement had been based, remained sealed. *Docket Document No. 137.* Defendant has still not been arraigned on the Superseding Indictment. *Docket Document No. 142.*

Defendant moves to strike the death penalty notification alleging that the government failed to file a timely motion as required by Local Rule 428 and 18 U.S.C. § 3593. *Docket Document Nos. 129, 131.* Defendant further moves to strike the notification on the grounds that such notice came as a result of an authorization by the Attorney General which violated his Fifth Amendment rights to procedural and substantive due process of law and equal protection of law, as well has his Sixth Amendment right to vicinage. *Docket Document Nos. 130, 132.*

The AUSA moves to arraign Defendant on the Superseding Indictment, *Docket Document No. 142,* and dismiss the Original Indictment. *Docket Document No. 143.* Defendant opposes these motions. *Docket Document No. 142.* On November 4, 2003, we ordered the parties to appear before the court on November 12, 2003, for a hearing to discuss the possible implication of the Speedy Trial Act, 18 U.S.C. § 3161, in the filing of the Superseding Indictment. *Docket Document No. 151.* The parties have appeared before the court. We hereby issue our written findings.

## II.

### *Analytical Overview*

The Original Indictment, filed March 12, 2003, lacks the *mens rea* and aggravating factors necessary to make the Defendant death-penalty eligible. *See Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *Almenda-rez–Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); *United States v. Promise,* 255 F.3d 150, 152 (4th Cir.2001). Although it took nearly four months, the prosecutor awoke to this deficiency and in an attempt to remedy it, obtained a Superseding Indictment which did not change the charges brought against Defendant, but appended a list of the required statutorily-enumerated *mens rea* and aggravating factors. Due to this substantial difference in the two indictments, it is dispositive that we determine which indictment is to be the controlling instrument in this case. Although the Original Indictment was filed within thirty days after Defendant's arrest as required by the Speedy Trial Act ("STA"), the Superseding Indictment was filed almost three months outside the requisite time period and it remained sealed for almost three months more.

As discussed *infra,* because the Superseding Indictment violates the STA, it must be dismissed. Furthermore, having considered the factors set forth in the STA to determine the terms on which an indictment must be dismissed, and due to the substantial and seemingly unending injustices committed as to Defendant, we find that the Superseding Indictment must be dismissed with prejudice.

The prosecution is, therefore, left to proceed on the Original Indictment. Because the Original Indictment is legally insufficient to support a sentence of death, we grant the Defendant's motion to strike the government's Notice of Intent to Seek the Death Penalty.

Although the government's STA violation would provide a more than sufficient basis on which to justify our result, additional considerations and prejudices to the Defendant presented by the particularities of this case and the botched management of it by the prosecution, leave us no other just recourse. Because these consider-

ations also compel our decision to strike the government's Notice of Intent to Seek the Death Penalty, we give due weight to these additional concerns after addressing the government's STA violation.

## III.

### *The Speedy Trial Act*

■ Although neither party had alleged an infringement of the Speedy Trial Act ("STA") prior to the November 12, 2003, hearing before this court, we note that the onus is not on the Defendant to ensure that the government or court comply with the STA's provisions. 18 U.S.C. § 3161. Because the rights afforded under the STA are guaranteed to a defendant as a matter of law, it is the shared responsibility of the court to ensure that the STA is not violated and it is, therefore, appropriate for this court to raise STA issues *sua sponte.*[1] *United States v. McAfee*, 780 F.2d 143, 146 (1st Cir.1985) ("[T]he primary responsibility for meeting the Act's requirements rests on the court."); *see also United States v. Ramirez*, 973 F.2d 36, 38 (1st Cir.1992). "The duty to comply with the Speedy Trial Act lies with the courts, not with defense counsel." *United States v. Williams*, 197 F.3d 1091, 1095 n. 7 (11th Cir.1999) (citing *United States v. Moran*, 998 F.2d 1368, 1371 (6th Cir. 1993)); *United States v. Saltzman*, 984 F.2d 1087, 1091 (10th Cir.1993) (affirming the court's role in protecting the speedy trial rights of the defendant and society); *see also United States v. Doran*, 882 F.2d 1511, 1517 (10th Cir.1989) (same); *United States v. Lowery*, 21 F.Supp.2d 648, 649 (E.D.Tex.1998) (stating that due to an STA violation, "[s]*ua sponte*, the court is required to dismiss the indictment").

This responsibility for ensuring that a criminal trial proceeds expeditiously, falls equally upon the government. *Doran*, 882 F.2d at 1517(placing the responsibility of providing a defendant with a speedy trial on the court and on the government, not on defense counsel); *United States v. Pollock*, 726 F.2d 1456, 1464 (9th Cir.1984) (same); *United States v. Bufalino*, 683 F.2d 639, 646 (2d Cir.1982) ("The responsibility for pursuing a prosecution lies entirely with the government."); *Barker v. Wingo*, 407 U.S. 514, 527, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (holding that the burden of protecting the speedy trial right falls on the government since clearly "[a] defendant has no duty to bring himself to trial"). For the government to argue that a potential STA violation, especially of their own making, should not be raised by the court, would only add insult to injury.

Thus, because the enforcement of the STA falls within the ambit of this court's inherent responsibilities, we gave notice to the parties and took up this matter on our own accord.

### A. *The Superseding Indictment*

■ The STA states that, inter alia, "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b) (1994 & Supp.2003).[2] Any indictment violating this provision offends the Sixth Amendment right to a speedy

---

1. Notice of a potential STA violation was given to the parties in a court order dated November 4, 2003. *Docket Document No. 151.* Furthermore, the parties were given the opportunity to argue such matters before the court in a hearing held November 12, 2003.

2. This provision functions independently and establishes a deadline separate from the STA's additional requirement that a defendant must be brought to trial within seventy days after the filing and making public of the information or indictment. 18 U.S.C. § 3161(c)(1); *United States v. Martinez*, 268 F.Supp.2d 70, 72 n. 3 (D.Mass.2003).

trial on which the STA is based, and must be dismissed. *United States v. Rivera Const. Co.*, 863 F.2d 293, 295 (3d Cir.1988). In the case at bar, the Original Indictment was filed well within thirty days of Defendant's arrest. However, the Superseding Indictment was issued almost four months after Defendant's arrest. The question then becomes whether the Superseding Indictment violated the STA's thirty-day rule.

In an attempt to precisely define the STA's reach, courts have delineated a number of situations where the statute does not apply to the filing of a superseding indictment. Several circuits have held that a superseding indictment issued more than thirty days after a defendant's arrest which adds entirely new charges to those contained in the original indictment does not violate the STA. *United States v. Hemmings*, 258 F.3d 587, 592 (7th Cir.2001); *see, e.g., United States v. Mosquera*, 95 F.3d 1012, 1013 (11th Cir.1996) (stating that "[t]he Speedy Trial Act does not guarantee that an arrested individual indicted within thirty days of his arrest must, in that thirty day period, be indicted for every crime known to the government failing

which he may never be charged"); *United States v. Orbino*, 981 F.2d 1035, 1037 (9th Cir.1992) (holding that not all charges against a defendant must be issued within thirty days after arrest); *United States v. Castellano*, 848 F.2d 63, 65 (5th Cir.1988) (rejecting the argument that the superseding indictment, alleging different charges from the original indictment but brought more than thirty days after arrest, was untimely).

■ In a similar vein, where a superseding indictment contains charges identical to those in the original indictment and is based on identical facts, the filing of a timely indictment tolls the thirty-day STA requirement. *United States v. Mitchell*, 723 F.2d 1040, 1044–45 (1st Cir. 1983); *United States v. Berry*, 90 F.3d 148, 151 (6th Cir.1996); *see, e.g., United States v. Perez*, 217 F.3d 323, 328 (5th Cir.2000) (finding that "where the superseding indictment adds no new facts and contains charges identical to those in the original timely indictment, the filing of the first indictment tolls the speedy trial 'clock' ").

In this case,[3] the Superseding Indictment does not fall squarely within either of

---

3. In the hearing before this court on November 12, 2003, both parties argue the applicability of *United States v. Martinez*, 268 F.Supp.2d 70 (D.Mass.2003), to which we referred in our order dated November 4, 2003. *Docket Document No. 151*. By directing the parties to consider *Martinez*, this court did not imply that *Martinez'* reasoning is controlling in the present case or that it necessarily presents the best analysis for the facts and circumstances before this court. It does, however, raise many of the issues we thought relevant in this case and thus served to give the parties notice of the concerns we wished them to discuss.

In *Martinez*, the district court held that a superseding indictment containing the allegation of "serious bodily injury" (an allegation the original indictment lacked) in connection with a drug possession and distribution charge under 21 U.S.C. § 841 brought more

than thirty days after the initial complaint which made the identical allegations, violated the STA. 268 F.Supp.2d 70, 71 (2003). The court held that under *Apprendi v. New Jersey*, 530 U.S. 466, 494[, 120 S.Ct. 2348, 147 L.Ed.2d 435] (2000), "serious bodily injury" was an element of an aggravated offense and, thus, the superseding indictment containing such a charge was untimely filed and must necessarily be dismissed. Although our interpretation of *Apprendi* in this case differs from that of the district judge's in that we do not consider aggravating factors to be elements of a greater, alternate offense, we do not dispute that such factors must be charged in the indictment and be proved before the jury. Furthermore, the *Martinez* court's decision to dismiss the superseding indictment comports with this court's analysis of gilded charges and the STA's applicability to them. In this sense, we do not find the result in *Martinez*

the above enumerated STA exceptions; it neither charged new offenses nor alleged identical offenses based on identical facts. As to Defendant, the offenses charged remained the same, but the prosecution appended its previously-omitted list of *mens rea* and aggravating factors. *Docket Document Nos. 12, 83.*

The Original Indictment, filed on March 12, 2003, stated in Count III that:

[F]rom on or about March 4, 2003, up to and including March 5, 2003 ... the defendants herein, aiding and abetting each other, and aided and abetted by others to the Grand Jury unknown, did will fully, intentionally and unlawfully possess, use or carry a firearm during and in relation to a crime of violence, as that term is defined in Section 924(c)(3) of Title 18, *United States Code*, that is, assaulting an individual who lawfully had charge, control, or custody of money of the United States, with intent to rob, steal, or purloin said money, ... an offense that they could be prosecuted in a court of the United States as a violation to Title 18, *United States Code*, Section 2114, and, in the course of that crime of violence, the defendants herein unlawfully killed A.V.G. with malice and aforethought through the use of a firearm, which is murder as defined in Title 18 *United States Code* Section 1111, by knowingly, willfully, deliberately and maliciously and with premeditation shooting A.V.G. with a firearm thus causing his death, all in violation of Title 18 *United States Code* Section 924(j) and 2.

*Docket Document No. 12.*

■ Count III of the Superseding Indictment, on which the government's Notice of Intent to Seek the Death Penalty is based, is identical to Count III in the original indictment. *Docket Document No. 83.* However, the Superseding Indictment appends a Notice of Special Findings which references provisions of the Death Penalty Act, 18 U.S.C. §§ 3591, 3592 (2000 & Supp.2003), and sets forth the aggravating circumstances required for the imposition of the death penalty as required by 18 U.S.C. § 3592. It states, *inter alia,* that Defendant (1) has a previous conviction of a violent felony involving a firearm (18 U.S.C. § 3592(c)(2)); (2) committed the offense in an especially heinous, cruel, and depraved manner in that it involved torture and physical abuse to the victim (18 U.S.C. § 3592(c)(6)); (3) committed the offense as consideration for the receipt, and in the expectation of the receipt, of anything of pecuniary value (18 U.S.C. § 3592(c)(8)); (4) committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

Clearly, the addition of the Notice of Special Findings cannot purport to be the type of minor variation in facts that allows an initial indictment to toll the STA clock, *United States v. Martinez–Espinoza,* 299 F.3d 414, 416 n. 4 (5th Cir.2002); *Mitchell,* 723 F.2d at 1044–45, for with this addendum comes the government's ability to seek the death penalty. It would be contrary to common sense to deem inconsequential the addition of facts that create the possibility of Defendant's death, where such a severe sanction did not previously exist. Thus, the Superseding Indictment cannot invoke the STA exception for an indictment charging identical offenses based on identical facts. The question then arises as to whether these aggravating factors constitute new charges or offenses which would also skirt an STA violation.

irreconcilable with the reasoning presented in the present case.

■ The issue of whether such aggravating factors are elements of a new, greater substantive offense has been the subject of significant debate, especially in light of the Supreme Court's recent decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that the jury, not the judge, must determine the presence or absence of any fact necessary to impose the death penalty. In its decision, the Court cited *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348, and characterized the "enumerated aggravating factors ... as 'the *functional equivalent* of an element of a greater offense.'" *Ring,* 536 U.S. at 609, 122 S.Ct. 2428(emphasis added).[4] Previously, in *Jones,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), the Supreme Court noted that:

> The constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment; these are the safeguards going to the formality of notice, the identity of the factfinder, and the burden of proof.

*Id.* at 243 n. 6, 119 S.Ct. 1215.

This trilogy of cases, *Ring, Apprendi,* and *Jones,* treat the requisite state of mind and aggravating factors necessary for a death-penalty sentence as elements of the offense alleged from a procedural standpoint only. *United States v. Acosta–Martinez,* 265 F.Supp.2d 181, 184–85 (D.P.R. 2003); *United States v. Sampson,* 245 F.Supp.2d 327, 332 (D.Mass.2003); *United States v. Lentz,* 225 F.Supp.2d 672, 680 (E.D.Va.2002). "The Supreme Court in *Ring, Apprendi,* and *Jones,* was addressing only the required procedures for find-

ing facts. These cases concern criminal procedure and not the definition of conduct that is criminal, which is a legislative function." *Acosta–Martinez,* 265 F.Supp.2d at 184 (internal citation omitted) (citing *Sampson,* 245 F.Supp.2d at 332); *see Lentz,* 225 F.Supp.2d at 680 ("In sum, the narrow holding of *Ring* did not mandate that aggravating factors must become elements of a new greater substantive offense."); *see also, Cannon v. Mullin,* 297 F.3d 989, 994 (10th Cir.2002) (stating that "*Apprendi* announced a rule of criminal procedure [which] forecloses [the] argument that *Ring* announced a substantive rule."). A majority of circuits have interpreted *Apprendi* to have announced a new rule of criminal procedure, not one of substantive criminal law. *United States v. Sanchez–Cervantes,* 282 F.3d 664, 668 (9th Cir.2002); *United States v. Sanders,* 247 F.3d 139, 147 (4th Cir.2001); *United States v. Brown,* 305 F.3d 304, 309 (5th Cir.2002); *Curtis v. United States,* 294 F.3d 841, 843 (7th Cir.2002); *United States ex rel Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002); *McCoy v. United States,* 266 F.3d 1245, 1257 n. 16 (11th Cir.2001). Because it is for Congress, and not the courts, to determine criminal conduct, it would be overstepping our judicial role to create an additional element for an offense, thereby establishing a greater, substantive crime. *Acosta–Martinez,* 265 F.Supp.2d at 184. We agree with the other courts which have held similarly and conclude that, although treated procedurally as elements of the offense, which must be charged in the indictment and submitted to the jury, these *mens rea* and aggravating factors are not new offenses for substantive purposes. As such, their inclusion in an indictment does not create

---

4. On the same day it decided *Ring,* the Supreme Court also decided *Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), in which a plurality of the Court stated that "those facts setting the outer limits of a sentence, are the elements of the crime *for the purposes of the constitutional analysis.*" *Harris,* 536 U.S. at 567, 122 S.Ct. 2406(emphasis added).

new charges which, under the other STA exception, could be filed at any time without violating the statute.

■ Therefore, the addition of the Notice of Special Findings to the Superseding Indictment constitutes neither inconsequential alterations to the Original Indictment nor creates new substantive charges. Instead, the Superseding Indictment "merely annotates in more detail the same charge[s] alleged in the initial accusatory instrument." *United States v. Bailey*, 111 F.3d 1229, 1236 (5th Cir.1997).[5] This type of charge that neither sets out new offenses nor alleges identical offenses based on identical facts, has been referred to as a "gilded charge".[6] *See id.; United States v. Giwa*, 831 F.2d 538, 542 (5th Cir.1987); *United States v. DeTienne*, 468 F.2d 151, 155 (7th Cir.1972). When the new indictment neither includes new offenses nor alleges identical offenses based on identical facts, it is merely a part of or only "gilds" the initial charge. *Bailey*, 111 F.3d at 1236. " '[A] gilded charge is one that merely annotates in more detail the same charge alleged in the initial accusatory instrument' [by, for example] merely add[ing] new supporting facts to the charge in the complaint." *United States v. Phipps*, 319 F.3d 177, 182 (5th Cir.2003) (quoting *United States v. Bailey*, 111 F.3d 1229, 1236 (5th Cir.1997)). "The subsequent, gilded charge is subject to the same Speedy Trial Act limitations imposed on the earlier indictment." *United States v. Andrews*, 790 F.2d 803, 809 (10th Cir. 1986). Because the Superseding Indictment was filed more than thirty days after Defendant's arrest, it violated the STA and must, therefore, be dismissed.[7]

**5.** We observe that the prosecution identified this case as a death penalty case on March 17, 2003, *Docket Document No. 17*, five days after Defendant was arraigned on the Original Indictment. The government must, therefore, have been at least entertaining the possibility of treating this case as a death penalty one. This being so, we are dismayed that the government allowed this case to proceed as long as it did, and past the STA deadline, on an indictment clearly lacking the necessary *mens rea* and aggravating factors required to impose the death penalty. Prosecutorial mismanagement seems to be the only reasonable explanation as to why a superseding indictment compliant with the requirements of the *Apprendi* line of cases was not brought within the thirty days required by the STA.

**6.** The gilding analysis has been adopted primarily, although certainly not exclusively, by the Fifth Circuit. Our search reveals a lack of First Circuit precedent directly addressing the type of situation presented by this case. This dearth of applicable case law is compounded by the fact that the STA's applicability with regard to aggravating factors which allow for a death penalty sentence, must now be considered in light of *Ring*, 536 U.S. 584, 122 S.Ct. 2428. *Ring* having been only recently decided, the courts have not yet fully flushed out these issues. Because we find the Fifth Circuit's interpretation to be most on point with the unique factual circumstances of this case, we rely on it to guide our analysis.

**7.** The government moves to dismiss the Original Indictment. *Docket Document No. 143*. Due to our present decision to dismiss the Superseding Indictment and because our ensuing analysis is premised in part on the existence of an Original Indictment charging Defendant with equally severe offenses, we deny the government's motion. In light of this opinion and order, we assume the government would not contest such a denial.

We also note, however, that if we were forced to otherwise evaluate the government's motion for dismissal of the Original Indictment under Fed.R.Crim.P. 48(a), the government's mere conclusory statement that the "Grand Jury returned a First Superseding Indictment," *Docket Document No. 143*, without its articulating any additional reasons for which the Original Indictment should be dismissed, provides us no sufficient basis for granting its motion. *United States v. Salinas*, 693 F.2d 348, 352 (5th Cir.1982); *see United States v. Hamm*, 659 F.2d 624 n. 23 (5th Cir.1981) (holding that "the prosecutor must present information in support of its motion to dismiss"); *see also United States v. Ammidown*, 497 F.2d 615, 620 (D.C.Cir.1974);

## B. *Dismissal of the Superseding Indictment*

■ Having determined that the Superseding Indictment must be dismissed, we note that the trial court is given wide discretion in determining the terms on which an indictment is to be dismissed. *Brown*, 770 F.2d at 242, *cert. denied*, 474 U.S. 1064, 106 S.Ct. 816, 88 L.Ed.2d 789 (1986) (stating, "determination of whether dismissal shall be with or without prejudice is left to the sound discretion of the trial judge"); *see also United States v. Nuñez–Javier*, 134 F.Supp.2d 236, 238 (D.P.R.2001); *United States v. Hastings*, 847 F.2d 920, 924 (1st Cir.1988) (explaining that the discretion afforded the trial judge under the STA allows him "to examine a variety of serviceable fabrics and measurements, and custom tailor an order of dismissal to suit the exigencies and equities of a particular case"). Although we held a comprehensive hearing, we exercise our discretion without the guidance of briefs or memoranda on the part of the government.

When deciding whether an indictment should be dismissed with or without prejudice, there is no presumption either way. *Hastings*, 847 F.2d at 924; *United States v. Johnson*, 29 F.3d 940, 946 (5th Cir.1994). Furthermore, the statute does not state how long a delay must be before it requires the court to dismiss with prejudice. However, the trial judge's discretion is channeled through three factors: (1) the seriousness of the offense; (2) the facts and circumstances of the case which led to the dismissal; and (3) the impact of a reprosecution on the administration of the STA and on the administration of justice.

18 U.S.C. § 3162(a)(1); *United States v. Scott*, 270 F.3d 30, 58 (1st Cir.2001); *see also Hastings*, 847 F.2d at 925–29. We consider each of the factors in turn.

### 1. *Seriousness of the Offense*

■ The offenses for which Defendant was charged, *inter alia*, assault and robbery with a firearm in connection with a violent crime, resulting in the victim's death, are undeniably serious. *Brown*, 770 F.2d at 244 (finding distribution and conspiracy to distribute cocaine sufficiently serious to militate in favor of dismissal without prejudice); *see also United States v. Martinez–Espinoza*, 299 F.3d 414, 418 (5th Cir.2002) (holding that a twenty-year sentence was indicative of a serious charge). A serious crime usually weighs in favor of dismissal without prejudice. *See Brown*, 770 F.2d at 244. We note, however, that this is premised on the notion "that 'the graver the crimes, the greater the insult to societal interests if the charges are dropped, once and for all, without a meaningful determination of guilt or innocence.' " *United States v. Barnes*, 159 F.3d 4, 16 (1st Cir.1998) (quoting *Hastings*, 847 F.2d at 925). Thus, the calculus of severity implicitly considers the finality of the case and the government's ability to vindicate the public interest.

In the present case, however, dismissal of the Superseding Indictment with prejudice would not greatly alter the government's recourse against Defendant. As noted, although the Notice of Special Findings in the Superseding Indictment gilded the charges contained in the Original Indictment, the underlying charges in the

*United States v. Strayer*, 846 F.2d 1262, 1265 (10th Cir.1988) (stating that the purpose of the rule was to protect the criminal defendant from prosecutorial harassment and allow courts to consider the public interest at stake, the fair administration of justice, and the preservation of judicial integrity when evaluating a motion to dismiss). Although we acknowledge that the prosecution does not bear the burden of proving that dismissal of the Original Indictment is in the public interest, we would further question, in this case, whether the government's motive in seeking a superseding indictment was premised on good faith as required under Fed.R.Crim.P. 48(a). *See Salinas*, 693 F.2d at 352.

two indictments are otherwise identical. *Docket Document Nos. 7, 83.* Thus, dismissing the Superseding Indictment with prejudice would allow for continued prosecution under the Original Indictment. We note that the charge under the Original Indictment allows a maximum penalty of life imprisonment without parole. Thus, a dismissal of the Superseding Indictment would still allow for continued prosecution and would not greatly offend society's notion of justice.

### 2. *Circumstances Leading to the Delay*

We next consider the facts and circumstances of the case which gave rise to the STA violation. 18 U.S.C. § 3162(a)(1); *Hastings,* 847 F.2d at 925. Under this prong, we look to the reasons for the government's delay in filing the Superseding Indictment. *United States v. Mancia–Perez,* 331 F.3d 464, 468 (5th Cir.2003); *Hastings,* 847 F.2d at 925 ("This aspect of the test focuses on the culpability for the delay-producing conduct."). In most cases involving simple negligence, dismissal without prejudice, while more likely, is not overwhelmingly the appropriate remedy. *See id.; Barnes,* 159 F.3d at 17. Rather, government negligence simply "weighs less heavily in favor of banning re-prosecution." *Hastings,* 847 F.2d at 925; *Barnes,* 159 F.3d at 17 ("ever so slightly in favor of dismissal without prejudice"); *But see Martinez–Espinoza,* 299 F.3d at 419 n. 13 ("[W]here the fault lies entirely with the government, this factor favors dismissal with prejudice.") (citing *United States v. May,* 819 F.2d 531, 533 (5th Cir.1987)).

If the government's failure to timely file the Superseding Indictment were, however, the result of prosecutorial misconduct, this would strongly favor dismissing the Superseding Indictment with prejudice. *Hastings,* 847 F.2d at 925 ("[A]ctions designed to gain unfair prosecutorial advantage weigh[ ] heavily in favor of dismissal

with prejudice."); *Barnes,* 159 F.3d at 17 (suggesting that prosecutorial misconduct would tend toward dismissal with prejudice).

Here, the government has offered no explanation for why it waited almost four months before filing the Superseding Indictment. Although there is no evidence that such delay was the result of intentional noncompliance with the STA, we are left to surmise that, at best, the violation was a case of poor prosecuting, arising from the prosecution's overdue realization that they failed to include the Notice of Special Findings necessary for death penalty eligibility. We underscore that the AUSA was directly supervised by AUSA. Edwin Vázquez, who appeared before this court. We, therefore, question the point at which the prosecution's repeated and unyielding failure to keep themselves appraised of the facts of their case, as well as the requirements of a procedurally-proper prosecution, rises from mere negligence to a level of willful blindness toward the duties of their job. We note that in a September 24, 2003, status conference before the court, the prosecution maintained that the only change to the Superseding Indictment was the addition of a fourth co-defendant, when, in fact, it also attached the aggravating factors which had been requested multiple times by Defendant as part of discovery. *Docket Document No. 137.* This addition corrected the Original Indictment's omission and ultimately rendered the Superseding Indictment *Apprendi*-compliant, making it the essence of the present controversy. We further note that the prosecution alleged, to both defense counsel and to this court, that the Superseding Indictment was sealed as to the fourth Defendant only, when it was, in fact, sealed as to all defendants. *Id.* In actuality, the Superseding Indictment remained sealed until September 24, 2003, *id.,* when it was unsealed by the court. *Docket Document Nos. 7, 83.* The prose-

cution's silence on the filing of the Superseding Indictment and the general circumstances surrounding the filing and lengthy sealing of the Superseding Indictment lead us to conclude that this cannot be seen as mere negligence. Given the general preference for dismissal with prejudice in situations where the government is at fault, we find that the prosecutor's conduct here favors such dismissal.

### 3. *Impact of Dismissal on Administration of the Act and on the Administration of Justice*

Finally, we must examine the effect that dismissal of the Superseding Indictment would have on enforcement of the STA and the administration of justice. This includes a consideration of both the length of delay, as well as the effect that the prosecutor's conduct had on the administration of justice and the prejudice which resulted from it. *Barnes,* 159 F.3d at 18; *see Martinez–Espinoza,* 299 F.3d at 419.

Here, the prosecution did not file the sealed Superseding Indictment until July 2, 2003, *Docket Document No. 83,* nearly four months after Defendant's arrest on March 9, 2003. A delay of such length presents a serious violation of the STA. *See Johnson,* 29 F.3d at 946 (considering 118–day delay "serious"). Although not determinative, the extent of the delay weighs in favor of dismissing the Superseding Indictment with prejudice. *See Barnes,* 159 F.3d at 17–18; *see also United States v. Williams,* 314 F.3d 552, 560 (11th Cir.2002).

Furthermore, actual prejudice to a defendant points toward dismissing an indictment with prejudice. *See Barnes,* 159 F.3d at 18. In this case, the inclusion of the aggravated factors carries greater implications than, perhaps, a more mundane

"gilding" situation. Here, the Superseding Indictment corrected omissions in the Original Indictment and thus created a death penalty case where otherwise none existed. Because the death penalty is such a severe sanction, heightened administrative, statutory, and jurisprudential safeguards have been created to ensure that a defendant is afforded a full and comprehensive opportunity to present his defense. The STA's established timetables speak directly to the heart of such safeguards and the government's disregard of them was, therefore, necessarily prejudicial to Defendant.

Although we recognize that any violation of the STA hinders both the administration of the Act and the administration of justice in general, a mere violation does not ordinarily provide adequate grounds for dismissal with prejudice. *Id.* Furthermore, general deterrence or a desire to reprimand a prosecutor does not, without more, substantiate a dismissal with prejudice. *See United States v. Taylor,* 487 U.S. 326, 342, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988) (condonation of government behavior is not sufficient reason to dismiss with prejudice).

Here, however, the prosecution's violation of the STA in this case, flagrantly undermined Defendant's efforts to fully and comprehensively defend himself. Because the Original Indictment did not comply with the *Apprendi* requirements and failed to include the necessary *mens rea* and aggravating factors, Defendant would have been correct to assume that the existing indictment could not be the basis of a successful death penalty prosecution. For four months, Defendant was denied the notice and opportunity to prepare his defense to the factors which would determine the application of the death penalty.[8]

8. We note that the prejudice to which Defendant was subjected prior to the filing of the

Superseding Indictment was further compounded by the prosecution's failure to unseal

Moreover, we find that dismissal of the Superseding Indictment with prejudice would not substantially hinder the administration of justice. As discussed, *supra*, the Original Indictment charges Defendant with crimes as serious as those set forth in the Superseding Indictment, charges that carry with them a maximum sentence of life in prison without parole. *Docket Document No. 7.* The gravity of the offenses charged in the Original Indictment ensures that "society's interest in bringing the particular accused to trial," *Hastings*, 847 F.2d at 925, will not be ignored.

Based on careful consideration of the seriousness of the offense charged, the facts and circumstances which led to the dismissal, and the impact of re-prosecution on the administration of justice, our foregoing analysis dictates that we must dismiss the Superseding Indictment with prejudice as to Defendant David Gómez-Olmeda.

## C. *The Sufficiency of the Existing Indictment*

■ Having determined that the Superseding Indictment must be dismissed, our final inquiry is whether the Original Indictment, as the controlling charging document, is sufficient to make the case death-penalty eligible. "In federal prosecutions, such facts [that increase the penalty for a crime beyond the prescribed statutory maximum] must also be charged in the indictment." *United States v. Cotton*, 535 U.S. 625, 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (citing *Apprendi*, 530 U.S. at 476, 120 S.Ct. 2348). The indictment must contain the statutorily-enumerated aggravating factors necessary to impose a sentence of death. *Apprendi*, 530 U.S. at 476, 120 S.Ct. 2348 (" '[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' ") (quoting *Jones*, 526 U.S. at 243 n. 6, 119 S.Ct. 1215); *see Ring*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (affirming *Apprendi* and overruling conflicting precedent in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)); *see also Acosta–Martinez*, 265 F.Supp.2d at 184 (" 'In light of *Jones* ... it appears to be a foregone conclusion that aggravation factors that are essential to the imposition of the death penalty must appear in the indictment.' ") (quoting *Lentz*, 225 F.Supp.2d at 680).

Both parties agree that the Original Indictment fails to include the requisite statutory mental state and aggravating factors which must be charged in order to make the case death-penalty eligible. *Docket Document Nos. 128, 133.* To wit, in its Opposition to Defendant's Motion to Strike Notice of Intent to Seek Death Penalty, the government concedes that "[t]he original indictment returned by the Grand Jury on March 12, 2003 does not contain the aggravating special findings pursuant to *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)." *Docket Document No. 133.*

Because the Original Indictment in this case does not contain the aggravating special findings necessary to impose the death penalty, we find that Defendant's Motion

---

the Superseding Indictment until two-and-a-half months later, on September 24, 2003. This unsealing occurred after the death penalty certification hearing in Washington, D.C., discussed *supra*, during which Defendant was supposedly afforded a full and fair opportunity to present mitigating factors as to why the death penalty should not be sought. Furthermore, the Superseding Indictment remained sealed throughout the parties' plea agreement negotiations. *Docket Document No. 130, Exh. A.*

to Strike the Death Penalty must be granted.

## IV.

### Additional Considerations

We further observe that even if it were not necessary to dismiss the Superseding Indictment, we would nonetheless grant Defendant's Motion to Strike the Death Penalty. We briefly discuss our reasoning below.

### A. Questions of Timeliness in Filing the Notice of Intent to Seek the Death Penalty

▇ In a matter as critical as a death penalty prosecution, this court should expect nothing less than strict compliance with the local and federal rules that have been established to help ensure a criminal defendant is not unduly prejudiced when his very life is at stake.

Local Rule 428, by which we must abide, *Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.*, 26 F.3d 220, 224 (1st Cir. 1994) (footnote omitted) (internal citations omitted), requires the "fil[ing of] a final Notice of Intent to Seek the Death Penalty within thirty (30) calendar days after submission of the Death Penalty Evaluation (DPE) form and prosecution memorandum to the Attorney General." Local Rule

428(11)(B)(3). *See United States v. Rosa-do–Rosado*, No. 97–049, 1998 WL 28273, at *3, 1998 U.S. Dist. LEXIS 673, at *9 (D.P.R. Jan. 15, 1998)(noting that, given the magnitude of a death penalty case, the court was not inclined to accept anything less than strict adherence to the local rules). Further, the Local Rules grant an aggregate term of one-hundred and eighty (180) calendar days to file the Notice of Intent to Seek the Death Penalty. "The government's failure to file a final Notice of Intent to Seek the Death Penalty within the specified maximum term, may cause the criminal matter to be treated as an ordinary felony case." Local Rule 428(11)(C).

In the present case, the Original Indictment was returned on March 12, 2003, *Docket Document No. 7*, but neither party explicitly [9] moved to extend the maximum 180 calendar days contemplated by Local Rule 428. The government did not file a Notice of Intent to Seek the Death Penalty until September 22, 2003, well beyond the 180–day deadline of September 8, 2000.[10] *Docket Document No. 116.* Because the government failed to abide by the specifications of Local Rule 428, this court would strike the Death Penalty Notice and treat the matter as an ordinary felony case. Local Rule 428(11)(C).

**9.** The government contends that Defendant and this court were aware that the extension for Defendant's plea from mid-August to September 23, 2003 was a result of the government's need to ratify the plea agreement with the DOJ, and that because this necessarily included the discussion of the death penalty's appropriateness, the 180–day timetable under Local Rule 428 was extended. We do not find nor does the government proffer, any statutory or administrative guideline which requires that the death penalty meeting be concurrent with a meeting to discuss possible plea agreements. This court was not aware of the government's continued contemplation of filing a Notice of Intent to Seek the Death Penalty and does not join the government in

its unsubstantiated assumption that the extension for Defendant's plea necessarily included an extension of the Local Rule deadline.

**10.** The government was aware that a Notice of Intent to Seek the Death Penalty was no longer timely as of September 22, 2003. In its Memorandum to the Assistant Attorney General, the government noted that the notice "should be filed on or before September 19, 2003." Memo. to the Assistant Attorney Gen., Sept. 3, 2003. Although it is unclear on what basis the government found September 19 to be the relevant filing date, it is nevertheless clear that the government knew that by September 22, 2003 the Notice of Intent to Seek the Death Penalty was overdue.

We note that the notice may also run afoul of the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591–3598, which applies to "any [federal] offense for which a sentence of death is provided." 18 U.S.C. § 3591(a)(2) (2000 & Supp.2003). The FDPA requires that the government file a Notice of Intent to Seek the Death Penalty within "a reasonable time before the trial or before acceptance by the court of a plea of guilty." *Id.* § 3593. The notice must set forth all aggravating factors that the government intends to prove as justifying a sentence of death. *Id.* § 3593(a)(2).

While the government received authorization to seek the death penalty against Defendant from the Attorney General as early as September 17, 2003, it did not file its Notice of Intent to Seek the Death Penalty until the afternoon of September 22, 2003. *Docket Document No. 116.* The Defendant's change-of-plea hearing was scheduled for September 23, 2003, less than a day after the government's notice was filed. *Docket Document No. 115.* It is unclear why, in a matter as pressing as this and with the change-of-plea hearing imminent, the government was not quicker to file such a notice. Notwithstanding any explanation for such delay, it seems clear that a time period of less than twenty-four hours between the government's filing of its Notice of Intent to Seek the Death Penalty and the change-of-plea hearing cannot be considered reasonable. *See United States v. Colon–Miranda,* 985 F.Supp. 31 (D.P.R.1997). Thus, for the additional reason that the government failed to comply with the requirements of 18 U.S.C. § 3593(a), its Notice of Intent to Seek the Death Penalty should be stricken.

## B. *The Attorney General's Hearing*

We have previously found that defense counsel must be given "a 'reasonable opportunity to present any fact, including mitigating factors, to the United States Attorney for consideration.'" *United States v. Peña–Gonzalez,* 62 F.Supp.2d 358, 361 (D.P.R.1999) (quoting January 27, 1995, Memorandum from Janet Reno, P B, Federal Prosecution in Which the Death Penalty May Be Sought). As we previously held in *Peña–Gonzalez,* "[A] capital punishment certification hearing is a 'critical' stage of a criminal proceeding where the 'substantial rights of a criminal accused may be affected.'" 62 F.Supp.2d at 363 (quoting *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967)). We found that this hearing "is of paramount importance in a capital case ... [which] can literally lead to a determination of life or death" and as such, determined that the Sixth Amendment right to counsel attaches at a death penalty certification hearing. *Id.* at 363–364. The present case is rife with procedural pitfalls which deprived Defendant of a full and adequate opportunity to present his mitigation defense in front of the DOJ. By failing to supply Defendant with court-ordered discovery regarding mitigation, by failing to clearly inform defense counsel as to the purpose of the meeting, by proceeding as though the pending plea agreement merely needed a rubber stamp of approval, and by keeping the Superseding Indictment under seal, the government's conduct, in essence, rendered the DOJ meeting meaningless.

The government failed to comply with the court's order granting Defendant's discovery requests. *Docket Document Nos. 97, 114.* Defendant first requested discovery on June 2, 2003, "to conduct our investigation into mitigation, and then be able to make a responsive presentation before Attorney General Ashcroft." *Docket Document No. 91, Exh. A.* At a July 9 status conference, the prosecution assured the court that the discovery materials would be provided within a few days.

On July 11, 2003, Defendant received a supplementary discovery packet, followed by a July 15, 2003, letter objecting, on a point-by-point fashion, to a number of the discovery requests. *Id.* at Exh. B. The government objected, for example, to discovery concerning the victim and his past criminal activities.

In Defendant's subsequent motion to compel, Defendant reiterated his need for the requested information. Defendant noted that the government's case was premised, in part, on a finding that the victim's death resulted from his being a federal informant. Without discovery, Defendant claimed he would be unable to present alternate reasons for the victim's death. Defendant also argued that materials concerning the victim's criminal involvement would aid in his preparation for mitigation. He further observed that the prosecution refused to identify with specificity the statutory and non-statutory aggravating factors that the government was considering in making its death penalty assessment.

The prosecution objected to Defendant's request pursuant to the DOJ Manual, Section 9–10.030, stating that the contents of the submissions to be presented to the DOJ concerning the decision to seek the death penalty were not discoverable. In response to defense counsel's direct request for the statutory and non-statutory aggravating factors being considered by the government, the government referred Defendant to the Death Penalty Act, 18 U.S.C. § 3593, for the possible aggravating factors that "may be considered to determine whether the death penalty is justified." The prosecution effectively put Defendant to the task of having to guess which aggravating factors might best support his own sentence of death.

On August 8, 2003, Defendant filed his first motion to compel, seeking, *inter alia,* materials which Defendant felt would be pertinent to his mitigation averments. *Docket Document No. 91.* On August 19, 2003, Defendant filed a second motion to compel, *Docket Document No. 94,* claiming that the prosecution failed to submit the taped conversations between the victim and Defendant, and conversations involving Defendant's purchase of a weapon. On August 20, 2003, we granted Defendant's August 8, 2003, motion, giving the prosecution two weeks to comply. *Docket Document No. 97.* The government continued to disregard the court's order. On September 8, 2003, we granted Defendant's August 19, 2003, motion to compel. *Docket Document No. 114.* As of September 24, 2003, Defendant contends that the government has yet to comply with the discovery requests, a contention that the prosecution opposes by claiming that Defendant did not have a right to portions of the omitted discovery.

In the present case, the meeting before the DOJ's Review Committee on Capital Cases was scheduled in Washington, D.C. for September 8, 2003. *Docket Document No. 130, Exh. C.* Defense Counsel, Mr. Stafman, was aware that acceptance of the proposed plea agreement was contingent upon the Attorney General's approval. *Docket Document No. 131.* Defense Counsel persuasively argues, however, that he was led to believe that the purpose of the meeting was to consider whether or not to accept the plea agreement, not to certify the case as death penalty appropriate. On August 26, 2003, Defense Counsel expressed his confusion regarding the purpose of the upcoming meeting and asked that the prosecution clarify any uncertainty. *Docket Document No. 130, Exh. A.* Furthermore, he unequivocally explained that due to the plea agreement reached between the parties, he had "stopped work, which was being done at government expense, on issues of mitigation." *Id.* In a

subsequent letter to the AUSA dated September 3, 2002, Mr. Stafman reiterated:

"I remain unclear about the nature of the upcoming meeting in Washington, given the fact that we have not hd [sic] the opportunity to submit a mitigation letter that we would ordinarily submit if there were no plea agreement. I understand that the meeting will be an opportunity to discuss and answer questions about the plea agreement ... When we realized there would be a plea agreement, we significantly slowed down the pace of our mitigation investigation as this no longer seemed relevant and would represent a foolish expenditure of the government's precious resources.... I must be perfectly clear: we are not prepared to go forth fully with matters of aggravation and mitigation ...."

*Id.*

Internal correspondence to the AUSA from the Office of the Assistant Attorney General, also dated September 3, 2003, makes clear that at the upcoming DOJ meeting, Defense Counsel was "expected to address the question of why the government should not seek the death penalty in the case at issue." *Email from Karen Borgerding, Capital Case Unit, Department of Justice, to Lynn Doble, Assistant United States Attorney (Sept. 3, 2002, 4:14).* In a letter to Mr. Stafman dated the following day, the AUSA explicitly stated that she was not authorized to subscribe to a plea agreement. *Docket Document No. 130, Exh. C.* Her only clarification regarding the content of the September 8 meeting, however, was that because it had not yet transpired, "the

Department of Justice [had] not had the opportunity to present its determination of the proposed plea agreement offers discussed between the parties." *Id.*

The AUSA's correspondence, at best, fails to expunge the ambiguity regarding the meeting's purpose. *Id.* The letter can easily be read as confirming Mr. Stafman's understanding that the Washington meeting's objective was to discuss the merits of the proposed plea agreement. *Id.* Because of the information from the DOJ to which the AUSA was privy and because of the AUSA's clear knowledge of Mr. Stafman's confusion, her failure to clarify the nature of the upcoming meeting can be regarded as an affirmative misrepresentation which exacerbated Mr. Stafman's lack of preparation to discuss mitigation.[11] Coupled with the prosecution's flagrant, and admitted, disregard of this court's discovery deadlines, we are left with the certainty that Defendant was deprived of a meaningful opportunity to defend himself. Had the government timely provided such discovery as required, Defense Counsel would have been able to use the sought materials in preparation for and during the death penalty certification meeting. Defense Counsel's representation before the Review Committee on Capital Cases was, therefore, severely compromised, putting his client at a grave disadvantage. *See, e.g., Anders v. California,* 386 U.S. 738, 744, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) ("The constitutional requirement of substantial equity and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client ...."). We find that the government's

---

11. Because the Superseding Indictment was still sealed as of the death penalty certification meeting; because, under the *Apprendi* line of cases, an indictment must contain the statutory enumerated aggravating factors in order to impose a sentence of death (factors the Original Indictment clearly failed to include); and because the parties had been heavily pursuing a plea agreement based on the Original Indictment, Mr. Stafman was further misled to believe that the issue of mitigation was not to be part of the meeting's agenda. *See supra* note 3.

behavior in a matter as serious as this cannot be tolerated. *See Peña–Gonzalez,* 62 F.Supp.2d at 363.

## V.

### *Conclusion*

We must approach the question of certification of the death penalty with the unique gravity appropriate for capital cases. Capital punishment is qualitatively different from any other form of criminal penalty we may impose. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). With it, we deny the convict any possibility of rehabilitation and order instead his execution, the most irrevocable of sanctions. *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Its severity demands a heightened need for reliability in the determination that death is the appropriate punishment in a specific case. *Caldwell v. Mississippi,* 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (citing *Woodson,* 428 U.S. at 305, 96 S.Ct. 2978).

This court is well aware that a prosecutor faces a myriad of procedural requirements which require a heightened level of diligence. And we have not turned a blind eye to the fact that within a legal department as large as that of the United States Government, it is not uncommon for directives as to case management to be received from those less intimately associated with the particularities of a given case. However, prosecutors, as attorneys, face the unique task of ensuring that truth is uncovered and society's best interests are met, even if it means a verdict in favor of their adversary. The prosecutor, as the representative of an impartial sovereign, has the peculiar obligation not necessarily to win a case, but to assure that justice is done. "He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

By failing, in this case, to abide by both this court's directives, as well as basic tenets of criminal procedure, the prosecution, both the AUSA and any immediate supervisor, have risked usurping not only this particular Defendant's fundamental rights, but also the judicial process upon which our sense of fairness is based. Through its mismanagement and backhanded attempts to correct its blatant mistakes, the prosecution has offended basic notions of fair play, insulting this court, as well as, we believe, society and the prosecutor's very profession. These transgressions compel us to act accordingly. We, thereby, **DENY** the government's Motion to Dismiss the Original Indictment and its Motion for Arraignment on the Superseding Indictment. We **GRANT** Defendant's Motion to Strike the Death Penalty.

The court will proceed to the Fed. R.Crim.P. 11 change-of-plea hearing, accepting the Defendant's straight plea of guilty to the Original Indictment.

**IT IS SO ORDERED.**